**In re NEW ENGLAND FISH COMPANY, a Maine corporation, also known as NEFCO, Debtor.**

**Bankruptcy No. 80–00864.**

United States Bankruptcy Court, W.D. Washington, at Seattle.

Feb. 15, 1983.

Opinion On Motion for Reconsideration Oct. 5, 1983.

certified public accountant and financial consultant, has worked for the trustee for over two years. Although Mr. Douglas' initial retention was pursuant to court order, the order expired approximately three and one half weeks after its entry and required payment of compensation to be upon petition and court order. Notwithstanding the limitations, Mr. Douglas continued to render services beyond the time limit set forth in the order and received compensation without following the procedure required and contemplated by the order. American Can Company, the largest unsecured creditor of the Chapter 7 estate, has objected to Mr. Douglas' fee request on numerous grounds.

## FINDINGS OF FACT

1. On May 19, 1980, an order was entered *nunc pro tunc* as of May 9, 1980, authorizing the employment of Mr. Douglas "upon the terms set forth on (sic) Exhibit A ... provided that all payment for services performed shall be made upon petition and order of the Court." It was understood by all concerned that payment was to be made only after notice to creditors and a hearing.

2. The order also provided that "there shall be a continuation of the foregoing contractual arrangements until June 12, 1980, then to be extended by order of the Court, and subject to review prospectively by the creditors' committee." No extension was ever sought or granted. No prospective review by the creditors' committee ever occurred.

3. The preamble to the order recites that the trustee desires to hire certain persons "for a limited term." The order authorizes the employment of Mr. Douglas, Mr. Rogers and Mr. Bailey. Mr. Rogers, the former president and chief executive officer of the debtor, was employed to assist the trustee in liquidating estate assets and to facilitate the transfer of records to the trustee. Mr. Bailey was to supervise the trustee's staff and identify estate assets and business relationships of the debtor.

Eugene J. Craig, Seattle, Wash., for American Can.

Wallace Aiken, Rodney J. Waldbaum, Seattle, Wash., for Douglas.

## FINDINGS OF FACT, OPINION and CONCLUSIONS OF LAW

SAMUEL J. STEINER, Bankruptcy Judge.

This case is a contested matter arising from a fee application. Mr. G.S. Douglas, a

416

4. Exhibit A to the order refers to Mr. Douglas' compensation as "$10,000.00 per month for a minimum three month period based on $75.00 per hour ... Payment to be made $5,000.00 semi-monthly starting May 31, 1980."

5. Exhibit A to the order also sets forth the services Mr. Douglas was to provide. It states: "The functions for which Mr. Douglas will be generally responsible include:

(a) Financial reporting of all bankruptcy transactions.

(b) Coordination of petitions and orders between trustee and bankruptcy court.

(c) Assist in negotiations with financial institutions, auditor, creditors, etc.

(d) Advise trustee in all financial matters relating to bankruptcy."

6. The order reflects the court's ruling on the trustee's Petition to Employ Specific Persons on an Emergency Basis. When the trustee qualified, confusion and disarray abounded. The trustee needed immediate assistance to effect an orderly transition and to commence liquidation of this (approximately) seventy million dollar estate. Hence, the need for the May 19, 1980 order.

7. Shortly after the expiration of the order, the trustee and Mr. Douglas agreed to continue Mr. Douglas' employment but changed the terms. Rather than $10,000 per month compensation, Mr. Douglas would receive a maximum of $7,500 per month. This arrangement was never brought to the attention of the creditors or the court for approval. The trustee and Mr. Douglas decided, between themselves, that neither court approval nor the advice of counsel were necessary.

8. Between the period May 12, 1980, and June 2, 1982, Mr. Douglas received $179,925 compensation from the estate. Mr. Douglas now seeks to have the court *post facto* approve such payments.

9. Mr. Douglas also seeks interim compensation in the revised amount of $35,055 for services rendered between June 2, 1982, and October 31, 1982.

10. The rate of compensation was initially set at $75 per hour. It was increased to $90 per hour on June 19, 1982. An order authorizing the increase was entered on November 3, 1982.

11. The order authorizing Mr. Douglas' employment was made available to him on or about the date of its entry, i.e. May 19, 1980.

12. The services rendered by Mr. Douglas were many and varied. Mr. Douglas supervised the preparation of various financial reports (e.g. "weekly reports", "cash reports", interest reports, disbursement reports, etc.), kept track of accounts receivable and inventory, obtained appraisals, participated in negotiations for the sale(s) of assets, aided auctioneers in liquidating assets, supervised the preparation of budgets, prepared bankruptcy status reports, reviewed and summarized claims, analyzed accounts payable where no claims had been filed, prepared petitions and orders for the disbursement of estate funds, assembled data for attorneys, charted and kept track of pleadings filed and orders entered in the bankruptcy case, attended numerous court hearings, negotiated with financial institutions, supplied data to auditors and to an outside accounting firm, developed a formula for settling preference actions, procured insurance for estate properties, participated in conferences relating to the disposition of the debtor's subsidiaries, managed the trustee's office, hired and fired staff, negotiated office leases, reviewed mail and responded, selected a word processor for the trustee's office, devised a filing system, prepared agendae for meetings with the trustee and his attorneys, personally picked up bank statements, delivered and picked up documents at the attorneys' office and court, engaged in legal research (e.g. prepetition interest issue), and handled the estate's repurchase agreements with the trustee's bank. After Mr. Bailey and Mr. Rogers left the estate's employ, Mr. Douglas assumed and performed many of their functions. Most of Mr. Douglas' services were beneficial to the estate.

13. For the period from May 12, 1980, to June 2, 1982, Mr. Douglas is unable to segregate how much time he spent on each item of activity. He did, however, keep track of the amount of time he spent on New England Fish Company matters (as opposed to consulting work for other parties) for the two-year period.

14. For the period from June 2, 1982, to October 31, 1982, Mr. Douglas did record his time (to the nearest hour), correlating the activity with the time.

15. The disbursement of funds to Mr. Douglas during the period from May 12, 1980, to June 2, 1981, is reflected in various Petitions and Orders Authorizing Disbursement to Reimburse Operating Account. For the period there are seventy eight such orders in the record, all of which were endorsed by counsel, presented to and entered by the Court. The disbursement to Mr. Douglas was buried in each order, i.e. it was only one of a multitude of disbursements listed in the exhibit to each order.

16. Mr. Douglas is a certified public accountant. He worked for fifteen years with two national accounting firms and for twenty years as a financial consultant. Mr. Douglas also acted as trustee in the bankruptcy of a cargo carrier concern.

## ISSUES

1. Should the court approve *post facto* the payments Mr. Douglas received from the estate during the period from May 12, 1980, to June 2, 1982? This requires an analysis of not only the effect of the failure to comply with the May 19, 1980 order and Bankruptcy Code sections 327 and 330 but also the effect of Mr. Douglas' continuing to work after court authorization expired. Further, assuming the applicability of the May 19, 1980 order throughout this two-year period, did Mr. Douglas perform functions beyond the scope of the duties delineated in the order; and, if so, what is the result?

2. Should the court award interim compensation for the period from June 2, 1982, to October 21, 1982? This involves a determination as to whether the services were duplicative, reasonable, necessary and within the scope of the duties set forth in the May 19, 1980 order. The issue also requires a determination of the adequacy of the fee application.

## DISCUSSION

Preliminarily, it is apparent that Mr. Douglas is a professional person within the contemplation of section 327 of the Code. Accordingly, the trustee may employ him only "with the court's approval." 11 U.S.C. § 327. Bankruptcy Rule 215 and Local Interim Bankruptcy Rule 2006 establish the procedure to obtain judicial approval: the trustee must file an application with the court setting forth the facts demonstrating the necessity for employment, the name of the professional to be employed, why s/he was selected, what services will be rendered, and the connections of the professional with the debtor, creditors, and parties in interest. Both rules contemplate the filing of the application for employment prior to services being rendered.

In the instant case, an application was filed and a court order entered. Unfortunately for Mr. Douglas, however, the court order was very specific about three matters: (1) that the authorization to employ be of limited duration, i.e. effective until June 12, 1980, to be extended only by court order; (2) that Mr. Douglas' employment (as with two other professionals) be subject to prospective review by the creditors' committee; and (3) that any payments for compensation be made only after notice and hearing ("upon petition and order of the court"). Putting aside the fact that Mr. Douglas received payment without prior court approval and failed to subject his employment agreement to the creditors' committee for its review, one salient fact remains: The order authorizing Mr. Douglas' employment expired on June 12, 1980. Hence, Mr. Douglas worked for two years without court approval.

What is the effect of his failure to obtain court approval for this two-year period? Courts facing this issue have acknowledged

its difficulty. Nonetheless, courts have consistently held that professionals who render services to bankruptcy estates without court approval forfeit their right to compensation from the estate. Thus, in *Beecher v. Leavenworth State Bank,* 184 F.2d 498 (9th Cir.1950) the court held that the attorney for the receiver was not entitled to payment for services rendered for a four and one half year period because he had failed to obtain a court order authorizing his employment (as required by General Order 44). *Beecher* followed the Eighth Circuit case, *Albers v. Dickinson,* 127 F.2d 957 (8th Cir.1942) which stated: "Without a full compliance with . . . the requirements [of General Orders 42 and 44 mandating an order authorizing employment and an order allowing compensation] . . . no attorney can legally receive or retain any . . . payments out of the estate for services which he may have rendered." *Id.* at 961. *Albers,* in turn, relied in part on the Second Circuit's opinion in *In re Eureka Upholstering Co.,* 48 F.2d 95 (2d Cir.1931) wherein Judge Learned Hand stated that "without an order of court . . . not only may [the attorney] not be retained, but he can recover nothing, no matter how beneficial, or how arduous, his services [for the receiver]." *Id.*

This admittedly harsh rule has been applied in cases involving non-lawyer professionals. Hence, in *In re Mork,* 19 B.R. 947 (Bkrtcy.D.Minn.1982) accountants who had rendered services to the estate for almost one year were denied compensation therefor because they failed to obtain a court order prior to working for the estate. Likewise, in *In re The Rene Press, Inc.,* 23 B.R. 381 (Bkrtcy.D.Mass.1982), accountants sought and were refused payment for providing services to the debtor-in-possession because they had failed to elicit prior court approval. In addition to denying their application for compensation, the court also mandated that funds already received by the accountants for post-petition accounting services had to be returned. Similarly, in *In re Morton Shoe Companies, Inc.,* 22 B.R. 449, 9 B.C.D. 654 (Bkrtcy.D.Mass.1982), two firms that had performed financial and accounting services for the debtor-in-posses-

sion were denied compensation because of the "longstanding rule" that prior court authorization is required if a professional desires payment from the estate. The court noted that the rule "is an absolute basic condition despite the fact that the services rendered may have been very beneficial or valuable to the estate and performed in good faith." *Id.* 22 B.R. at 450, 9 B.C.D. at 655. *See also In the Matter of Schatz Federal Bearings Company, Inc.,* 17 B.R. 780 (Bkrtcy.S.D.N.Y.1982) (involving financial consulting services); *In re Holiday Mart, Inc.,* 18 B.R. 212 (Bkrtcy.D.Ha.1982) (involving architectural services); *In re Cummins,* 8 B.R. 701 (Bkrtcy.C.D.Cal.), *rev'd on other grounds,* 15 B.R. 893 (Bkrtcy. 9th Cir.1981) (involving real estate brokerage services); *In re C.H. Stuart, Inc.,* 16 B.R. 296 (Bkrtcy. W.D.N.Y.1981) (ditto); *In re Pollock,* 22 B.R. 673 (Bkrtcy.D.Mass.1982) (ditto); *In re Hucknall Agency, Inc.,* 1 B.R. 125 (Bkrtcy. W.D.N.Y.1979) (involving accountant; monies received had to be returned).

Why such a seemingly harsh rule? The primary purpose of this rule is to keep tabs on and curb administrative expenses. In *In re Pollock,* 22 B.R. 673, 675 (Bkrtcy.D.Mass. 1982) the court elucidated the rationale underlying the denial of compensation, quoting from *In re Owl Drug Co.,* 16 F.Supp. 139, 148 (D.Nev.1936):

"Were the law otherwise, there would be no limit to the burden which might be placed upon an estate if attorneys for the bankrupt or individual creditors could, by doing work which it is not their duty to do, by assisting the trustee, without an order of court allowing their special employment, burden the estate with the added cost of performing work which it is the duty of others to perform. The bankruptcy court would lose control in the matter of fees. 'Volunteers' would be numberless . . . And unpleasant though the task of rejecting claims of attorneys for services actually rendered in bankruptcy, when either not authorized or incurred in violation of the General Orders of Bankruptcy or of Rules of Court, may

have been, at times, courts have performed it repeatedly and unhesitatingly." The court in *In re The Rene Press, Inc.,* 23 B.R. 381, 9 B.C.D. 865 (Bkrtcy.D.Mass.1982) also noted the necessity of the rule to ensure judicial control over administrative costs. It then quoted from Judge Learned Hand's opinion in *In re Siegel,* 252 F. 197 (N.Y.1918), *rev'd on other grounds,* 256 F. 226 (2d Cir.1919):

"The court must look to the receiver as the adequate custodian and the sole person who can establish any claims for administration, except such as are otherwise expressly authorized by statute. Any services rendered by those not authorized by the receiver must be deemed to be on the account of the creditors who undertake them. They are merely volunteered, and the estate, even though actually benefited, owes nothing for them. There is no hardship in this, but absolute justice. Any creditor may apply at any time to the court upon suggestion that the receiver should authorize him to assist, and the court can so direct. But to allow claims to be established for benefits, suppositious or actual, without some initial indication the services upon which they are based would be the subject of a charge, is wrong in principle and mischievous in application. An estate in the custody of a court is not in need of voluntary services; there is no room for the doctrine of salvage. It is presumably being cared for adequately, and those who seek to impose upon it the benefit of their assistance do so at their own account, unless they secure some consent at the outset."

*Id.* at 198. Collier summarizes the law in this area: "When there is no compliance with the Code or rules, there is no right to compensation. The services ... must have been performed pursuant to appropriate authority under the Code and in accordance with an order of the court ... Otherwise, the person rendering services may be an officious intermeddler or a gratuitous volunteer ... even though valuable services were rendered in good faith." 2 Collier on Bankruptcy ¶ 327.02 (15th ed. 1982).

Although many of the cases cited above arguably are distinguishable from the instant case in that they did not involve a professional who was retained initially by court order, the Ninth Circuit has made clear that this is a distinction without a difference. In *Newport v. Sampsell,* 233 F.2d 944 (9th Cir.), *cert. denied,* 352 U.S. 942, 77 S.Ct. 264, 1 L.Ed.2d 238 (1956), the trustee hired Mr. Newport to assist him in operating and managing estate properties. The bankruptcy judge entered an order authorizing such employment. Pursuant to the order, Mr. Newport's salary was to "continue so long as said F.P. Newport shall be employed by said Trustee or until further Order of this court." Despite the fact that the trustee terminated Mr. Newport's employment over six years later, Mr. Newport continued to render services, submitting a $161,400 claim therefor. The Ninth Circuit sustained the disallowance of the claim, stating, "[t]he terms of the employment of Newport were regulated by the order. When the authorization expired by its own terms, continued employment was precluded thereby." *Id.* at 946. The court found as a matter of law that Mr. Newport was a volunteer. It also dismissed Mr. Newport's assertion that the trustee was estopped from disapproving his claim because the trustee misled him to his detriment. The court noted that "[i]t is not for [the trustee] to estop an estate, and thereby creditors, out of a substantial part of its assets. It is well settled bankruptcy law that on important decisions, whatever their character, the trustee must get the court's approval ... Those orders have long ago spent themselves." *Id.* Finally, the court made it clear that the subject of the order is charged with knowledge of its terms.

Inasmuch as the terms of the order govern Mr. Douglas' employment, his fee application for *post facto* approval must fail. The approximate one-month term of his authorized employment expired long before the vast majority of the services were rendered. Mr. Douglas failed to obtain an extension of the order authorizing his employment. He also failed to submit his employment arrangement to the creditors'

committee for its review. Further, Mr. Douglas failed to comply with the notice and hearing requirements of section 330.

Notwithstanding Mr. Douglas' non-compliance with the May 19th order, the Bankruptcy Code and Rules, Mr. Douglas asserts that the court should exercise its equitable powers and belatedly approve the compensation he has received. Mr. Douglas points to the inadvertence of the failure to comply, the beneficial services provided the estate, the lack of prejudice resulting from his non-compliance, and the tacit judicial approval stemming from the entry of the 78 disbursement orders. Mr. Douglas cites 11 U.S.C. § 105 in support of his request for equitable relief. Section 105 gives bankruptcy courts the power to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." It appears, however, that if this court were to issue an order approving the compensation already paid to Mr. Douglas, it would be controverting the provisions of the Bankruptcy Code, rather than enforcing them. Specifically, an order approving compensation at this point would render meaningless the requirements of sections 327, 330 and 331 mandating court authorization of professional employment and payment only after notice and hearing. Furthermore, if the court were to use its equitable power to approve compensation already received, it would be contravening the order of May 19, 1980.

Alternatively, Mr. Douglas seeks the entry of an order *nunc pro tunc* authorizing his employment for the two-year period. The facts of this case do not warrant *nunc pro tunc* treatment. First, the purpose behind such an order is to "make the record speak the truth," for "[i]t cannot be made to supply an omission to make an order but only an omission in the record of the order." *In re Mork,* 19 B.R. 947, 949 (Bkrtcy.D. Minn.1982). *See generally* 2 Collier on Bankruptcy ¶ 327.02 at 327–7 (15th ed. 1982) (doubting propriety of *nunc pro tunc* device to obviate lack of prior court approv-

al authorizing employment). The instant case involves the failure to make an order (extending Douglas' employment) rather than an omission in an order. Second, the entry of a *nunc pro tunc* order also would be inappropriate because of the failure to obtain prospective review by the creditors' committee, the fact that the original order expired, and the *ex parte* change of terms by Mr. Douglas and the trustee. Third, this court cannot make the findings necessary to justify an order *nunc pro tunc* as set forth in *Laurent Watch Co., Inc.,* 539 F.2d 1231 (9th Cir.1976). In *Laurent Watch,* the referee, prior to any work being performed, made the requisite determinations spelled out in General Order 44, i.e. he knew the terms of the employment, the background of the professional, and the functions to be performed. In contrast, this court did not know the basis of Mr. Douglas' employment, its terms, or the nature and extent of his activities until the present fee hearing which was over two years after the entry of the May 19, 1980 order. Hence, *Laurent Watch* is inapt to the facts of this case.

Further, even if one assumes that Mr. Douglas had received judicial approval to extend his tenure of employment and had complied in all other respects with the provisions of the May 19, 1980 order and the Bankruptcy Code (or that Mr. Douglas would be entitled to a *nunc pro tunc* order), the issue then arises: Did Mr. Douglas perform functions beyond the scope of duties delineated in the May 19, 1980 order? Mr. Douglas and the trustee contend that every service rendered was of a financial nature and, thus, within the order's scope.

The court disagrees. Many of the services Mr. Douglas rendered blatantly exceeded the scope of the May 19th order. For instance, Mr. Douglas' assistance at auctions, procuring of insurance, negotiating office leases, performing messenger duties, conducting legal research, claims work, and managing the trustee's office clearly are beyond even the most liberal reading of the May 19th order.[1] Moreover, making the

---

1. Mr. Douglas denotes himself "chief professional financial assistant" to the trustee. If the

trustee desired to employ Douglas as something more than a financial consultant, he argu-

same assumptions, there is no way for the court to segregate the amount of time Mr. Douglas spent on services within the order's scope from services beyond the order's perimeters. For the two-year period at issue Mr. Douglas failed to keep detailed time records.[2] Accordingly, Mr. Douglas' request that the court *post facto* give its stamp of approval to compensation he already has received must be denied.

■ Turning to Mr. Douglas' request for interim compensation for the period from June 2, 1982, to October 31, 1982, a different problem is presented. Inasmuch as Mr. Douglas received court approval to render professional services to the estate at $90 per hour as of June 2, 1982, the issue of performing work without authorization is not before the court. The court is, however, faced with the assertion that the services for this period duplicated those of the trustee, were unreasonable, were unnecessary, and went far beyond financial consulting.

To some extent the objections are well taken. On June 3, 1982, Mr. Douglas commenced keeping contemporary time records on a daily basis. Therefore the court is able to segregate the time spent on services within the scope of Mr. Douglas' duties from those that were not. A review of the records indicates that for the period in question a maximum of one hundred hours (using a most liberal approach) were spent on financial matters and coordination. The balance of the time was spent on matters beyond the scope of Mr. Douglas' employment, i.e. liquidating assets, working on claims, administering the trustee's staff, etc.

Accordingly, Mr. Douglas is entitled to compensation for services rendered from June 2, 1982, through October 31, 1982, in the sum of $9,000 ($90 times 100 hours).

CONCLUSIONS OF LAW

1. Mr. Douglas is a professional whose retention required court approval pursuant to 11 U.S.C. § 327.

2. Mr. Douglas' request for confirmation of the $179,925 compensation he received from the estate from May 12, 1980, to June 2, 1982, should be denied, and the objection of American Can Company should be sustained for the following reasons:

(a) The order of May 19, 1980, authorizing the employment terminated shortly after its entry and was not renewed. The vast bulk of the services were rendered after the order had terminated.

(b) Mr. Douglas failed to comply with certain provisions of the order, e.g. prospective review by the creditors' committee, extension by court order, etc.

(c) The compensation was paid in violation of the "notice and hearing" requirements of 11 U.S.C. §§ 330 and 331.

(d) Mr. Douglas failed to comply with 11 U.S.C. § 327 when he continued to perform services after judicial authorization had expired.

3. The facts do not warrant the entry of an order *nunc pro tunc* or the exercise of the court's equitable powers.

4. Alternatively, assuming that Mr. Douglas had obtained court approval for the two-year period, most of the services he rendered exceeded the scope of the duties outlined in the May 19, 1980 order. The lack of detailed time records has made it

---

ably could have. Or, if he desired a chief lieutenant, he arguably could have employed one. Or, if he wanted someone to act as chief of staff to do whatever the trustee said, he should have hired one. The common understanding of terms used in the order authorizing employment surely must establish the outer perimeters of a professional's duties. Otherwise, a professional could render any services to an estate and justify such actions by urging a broad reading of the order authorizing the employment. Mr. Douglas' assertion that payment should be approved because he assisted

the trustee in carrying out his duties (citing § 327) ignores the explicit terms of the May 19, 1980 order.

2. Bankruptcy Rule 219(a) requires a "detailed statement". Mr. Douglas contends that he should not be held to attorney's standards in preparing time records. Mr. Douglas is an accountant, however, and accountants do and must keep time records. Moreover, Mr. Douglas held himself out as a bankruptcy expert. An expert would know to keep time records.

impossible to segregate "proper" (within scope) from "improper" (beyond scope) services.

5. Mr. Douglas will be directed to turn over the $179,925 he received during the two-year period to the trustee.

6. For services rendered during the period from June 2, 1982, through October 31, 1982, Mr. Douglas is entitled to compensation in the sum of $9,000.

7. The $9,000 should be offset against the $179,925 owed to the estate.

8. Counsel for American Can Company will prepare and present an appropriate order.

### OPINION ON MOTION FOR RECONSIDERATION

After entry of the Court's written opinion, Mr. Douglas requested that the case be reopened and that the Court reconsider its prior ruling.

The motion to reopen was based on the ground that the Bankruptcy Judge who administratively handled the case would testify that he was well aware of Mr. Douglas' work on behalf of the debtor's estate and that somehow he approved Mr. Douglas' activities despite the expiration of the May 19, 1980 order. The Court granted the motion to reopen to ensure that all relevant facts would be taken into consideration before the entry of any judgment. Thereafter, the Judge was deposed. The Court ordered the deposition published (over American Can's strenuous objection) so that, in the interests of justice, it could determine whether there existed any additional relevant facts not previously considered.

The Court has reviewed the deposition and concludes that it neither adds to nor detracts from its store of knowledge.

■ Turning to the motion for reconsideration, Mr. Douglas contends that by entry of the November 3, 1982 order continuing the employment at a higher rate of compensation, the creditors, the Court and the estate are somehow estopped from objecting to and/or denying the compensation sought for the period from June 2, 1982 through October 31, 1982. Mr. Douglas also asserts that, for the period prior to June 2, 1982, he was entrapped by the trustee and the trustee's counsel, who allowed him to be paid regularly despite the lack of an extension of the May 19, 1980 order, review by the creditor's committee or specific court approval after notice to creditors. Mr. Douglas also argues that the facts of the case of *Laurent Watch Company, Inc.,* 539 F.2d 1231 (9th Cir.1976) do not differ from the instant case. Finally, Mr. Douglas contends that the Court cannot compel him to turn over the funds received as improper compensation in the absence of an adversary proceeding.

Addressing the estoppel argument first, the "Petition to Amend Order Approving Compensation of G.S. Douglas, Consultant to Trustee" was filed on May 18, 1982. It recites that "Upon petition, the Court heretofore entered an order dated May 19, 1980, authorizing application to employ Mr. G.S. Douglas as consultant to the Trustee, identifying functions for which Mr. Douglas would be responsible and his hourly rate .... The duties of Mr. Douglas will remain the same as previously established." Notice of hearing on the application was sent to creditors on May 21, 1982 and a hearing was set for June 9, 1982. The Order Authorizing G.S. Douglas Compensation Rates (entered on November 3, 1982) recites that American Can objected to the entry of the Order. The docket sheet indicates that a hearing was held on June 9, 1982 and that "the Court overruled Mr. Craig's objection and authorized the trustee to hire Mr. Douglas at $90 per hour and directed him to follow rules as to employment of any professional." An "Order Approving Employment and Hourly Rate of G.S. Douglas, Consultant to the Trustee" was entered on June 29, 1982 and also recites that Mr. Craig (counsel for American Can) objected to the entry of the Order. The November 3, 1982 Order is more specific than the June 29th Order in that it provides for compensation at $90 per hour from June 1, 1982 "on an average minimum of 80 hours per month." At the time of the

June 9, 1982 hearing, the Court was not aware of the myraid of facts later revealed at the hearing in this matter which did not commence until November 16, 1982. For instance, and referring to only two matters, this Court was not told and did not know that the May 19, 1980 order had expired or that Mr. Douglas had failed to confirm his future employment with the creditor's committee. Additionally, the petition filed on May 18, 1982 seems to say that Mr. Douglas' duties would remain the same as those specified in the May 1980 order. Assuming that estoppel can run against a court, the facts do not support an estoppel argument. Hence, services rendered by Mr. Douglas after June 1982 that went beyond those authorized in the May 1980 order are not compensable out of the estate.

■ Turning to the entrapment argument, it is apparent that Mr. Douglas was not entrapped. The original order authorizing his employment was available to him at any time, and in all likelihood he read it and was familiar with its terms at or about the time it was entered. In addition, Mr. Douglas' trustee work in a prior bankruptcy case and his self-proclaimed expertise in the bankruptcy field preclude any claim of entrapment. Further, Mr. Douglas would not be in his present situation as to compensation had he observed the May 19, 1980 order or previously sought legal advice which was readily available from counsel for the trustee with whom he was in constant contact. Assuming that entrapment can be asserted as a defense in a civil action, Mr. Douglas entrapped himself.

■ Mr. Douglas advanced the argument that the *Laurent Watch* case is not distinguishable from the case at bar, and hence, a *nunc pro tunc* order is appropriate. The Court fully and carefully considered the *nunc pro tunc* argument. The deposition of the Judge who handled the case administratively does not change the Court's conclusion as to the propriety of a *nunc pro tunc* order. The Court has also considered the Fifth Circuit case, *Matter of Triangle Chemicals, Inc.*, 697 F.2d 1280 (5th Cir. 1983). There, the Fifth Circuit held that

the Bankruptcy Judge has the *discretion* to enter a *nunc pro tunc* order in circumstances where counsel for the debtor-in-possession failed to secure a prior court order authorizing his employment. The *Triangle Chemicals* case is distinguishable from the case at bar in at least three respects. First, this Court obviously is cognizant of the fact that it has the discretion to enter a *nunc pro tunc* order under the circumstances outlined in the Ninth Circuit case of *Laurent Watch Company;* it, however, has chosen not to exercise such discretion in Mr. Douglas' favor, having concluded that *Laurent Watch* is not applicable to these facts.

Second, the *Triangle Chemicals* case did not involve a prior court order that had expired by its own terms, that had not been complied with, and that was never extended.

Third, in *Triangle ·Chemicals* the Fifth Circuit was concerned that the applicant may have been confused as to whether a court order was necessary in light of prior cases distinguishing between a "debtor" and a "debtor-in-possession". *Id.* at 1290.

In short, a *nunc pro tunc* order is not appropriate under the circumstances of this case.

■ Finally, Mr. Douglas argues that *In re Rene Press Inc.*, 29 B.R. 446 (Bkrtcy.App. 1st Cir.1982) precludes an affirmative judgment against him for a return of the funds. In the *Rene Press* case the Bankruptcy Appellate Panel was concerned not only with the failure to commence an adversary proceeding for turn-over, but also with the fact that the applicant had not really been given an opportunity to be heard. In the case at bar, it is true from the technical procedural approach that this is not an adversary proceeding. Notwithstanding, the proceedings in this compensation case have amounted to a full fledged trial. Documents were introduced into evidence and many hours of testimony were taken. Extensive briefs were written by counsel on both sides. It is difficult to imagine that anything different would have occurred had the proceeding been styled an adversary proceeding (ex-

cept, perhaps, a pretrial order may have been required). It would be a waste of judicial resources and attorneys' time to require an adversary proceeding to recover the funds at this or at a future point in time. Moreover, the findings and conclusions entered in this proceeding would likely be res judicata (or more precisely, collateral estoppel) in a turn-over proceeding. Accordingly, the Court concludes that the turn-over judgment entered in this case flows logically from the Court's ruling and does not require the commencement of a separate adversary action.

The motion for reconsideration should be denied, and judgment should be entered pursuant to the Court's opinion of February 15, 1983.